OPINIONS OF THE COURT.
Mr. Justice Richardson.
— The brig Amelia, Captain Dickinson, with 110 passengers, was stranded on the coast of South-Carolina, in November, 1832.
The plaintiff, Jarvis, was employed by J. & J. Calder, the consignees of the Amelia, to save the cargo; and to receive salvage, for his risk and trouble.
But, Jarvis was to act in subserviency to the police of Charleston;, because, the brig, although without the harbor, Jay within about thirteen miles of the city; and the Asiatic cholera raged on board; and, there was a great public alarm.
In pursuance of his undertaking, Jarvis obtained the permission of Mr. Pinckney, the Intendant of Charleston, for himself, and certain other persons, to enter upon the work; on the condition, that they would not return to the city, without permission; and would place themselves under the command of an officer; and obey his orders. Upon obtaining such permission, Jarvis contracted w'ith thirteen other men, to assist in the work of unloading the brig. The primary contract, between Jarvis and the consignees, appears, by their letter to Captain Dickinson. The permission of the Intendant is given, in due form, under a forfeiture of all salvage, for breach of the stipulated conditions. And the sub-contract, between Jarvis and his men, recognizes the contract with the Calders, the prudential conditions required by the Intendant; and adds, &c. “ Should they be discharged by the officer in command, they shall forfeit all claims to such salvage.” •
This final contract, is signed by Jarvis and his associates, contení-poraueously, with the first contract, and the Intendant’s permit, (3d November, 1832.) And, it most clearly unites with them, in constituting a specific, peculiar, and binding agreement; in which, Jarvis and his assistants, place themselves under the control of the police, in order to guard against the extension of the cholera, under the penalty of the entire forfeiture of their prospective gains; w'hich would, of course, in that event, enure to the benefit of the consignees and owners.
Jarvis proceeded, instantly, to the wreck; landed a large part of *129 the cargo on Folly Island, with the' éonáfenf óf the Captain of the' Amelia, who acted under the express orders of the consignees; and with the ohvious acquiescence of the numerous passengers.-
In this state of things, on the 6th of November, the defendant, Knighi, with a part of the City Guard, and acting under a resolution of the City Council, of which Pinckney was one, took possession of the brig, and the cargo, in, and out of the hull; and destroyed them,by fire — for the parpóse of preventing the spread of the cholera.
The plaintiff, (together with Captain Dickinson,) protested against the act; and Jarvis brought this action, for a- remuneration', in money,of the entire cargo.
It is Seen, at a glance, that the rights óf moré than a hundred different claimants, passengers and owners, are before the court; at least, in the principle of this action. But, besides involving the claims of many persons, the facts present a case of great novelty — of some public importance. And, it has been, accordingly, carefully considered, and luminously discussed by the counsel. The case has been connected with some of the original principles of the social compact; and with some of the leading objects of practical government. I will take up, very succinctly, the series of arguments used on both sides, in order to refer more clearly to the chief topics of law.
The right to abate public nuisances, belongs naturally to the de--' fence; as it had been brought to bear, practically, upon the brig and cargo, stranded on our coast; and, of course, entitled to hospitality. But, unfortunately, she carried in her hull, the modern plague, which seems destined to visit the four corners of the earth; and, to chastise' mankind with sudden death.
There was, then, no little cause for the alarm, which followed the’ reports of cholera. Our protection could not be expected for a vessel, bearing the pestilence, which strikes, at the race of man, with such fell swoop. And she was, therefore, destroyed, by fire, as a-sacrifice to public safety.
Who can blame the act, so far?- Not one.- But, with the brig, the' cargo, in and out of the hull, was also burnt.-
This whole trespass is justified, on the part of the defendants — 1. Under the right, to abate common nuisances. 2. By the eminent do-’ main of government. 3. For the safety of the people, which is the true; and, therefore, the prime object of government. And — 4. By virtue of the vox populi; which, no doubt spoke out, and spread terror, upon the occasion. Of this last, I will get rid, at once; in order,to take a step, in clearing the way, for the proper argument.-
The popular voice, when it springs up, from a settled public opinion, is truly, as law.’ — Law yields to its correction.
But, let us not connect, with the authority of a settled public con> viction, the sudden tremor of the alarm-bell; which may rise up, like* the mushroom patriots, described by Lord Chatham, a hundred of & night. But, as the mushroom, is not the parental oak, which strikes' deep, and rises high, — spreads wide, and- continues long to repress the tempest, and protect his minor fellows of the forest, — So the sudden, loud cry of false fear, is not the expression of that confident-opinion of men, which incommodes some,- in order to ensure the gen *130 eral safety — restrains intemperate zeal; but, urges the discharge of the highest duties, upon great personal responsibility, for the hest purpose.
And which, by the moral authority of its object, represses the law, that stands in its way; and becomes, itself, paramount law. There is, then, a rational philosophy, in the superlative maxim, “ Vox populi; vox Dei,” which may find a place, upon some occasions. Aud, which, on the very one, before us, will be found, to have its proper influence, to its just aud rational extent.
5. Finally: On the part of the defence, the remedy, by fire, has been extolled, as shewn, by the successful experiment made, to be the sovereign preventive against the introduction of Asiatic cholera. And the defendants claim to be acquitted altogether, or to allow the plaintiff only nominal damages; aud look for the public thanks, for the good done, by the wholesome energy of the city authorities; and the activity of their officers.
On the part of Jarvis, the array of argument, has been no less imposing.
The protection of private property, as the “ sine qua non,” of free governments — Aud the constitutional pnuciple, of just and full compensation, for property, taken for public uses, are pressed upon us, as sacred principles, in all orderly societies.
And the plaintiff, demands retributive justice, against the defendants, as for a debt plainly due; and not to be resisted.
On his part, the boasted remedy, by fire, has been stoutly repelled, and as loudly decried, as'though it smelt of the fire and faggot of the bigot, Mary oí England. Or, as if, like Pandora’s box, it was full of all sorts of abominations.
But, even here, a sound discrimination was very observable; and the hope, which lay at the bottom of the old box of evils to mankind, was not rejected for the plaintiff. It was fairly taken- up, in the ardent hope, to be realized, by a new trial, in a prospective verdict, for fifty thousand dollars.
Some collisions were, perhaps, to.be looked for, and the rather high tone of the argument, on both sides, was in no bad keeping, with such a case. But the court must consider it in a judicial way, — proceeding, with rational confidence ; while we pay due respect to the great doctrines connected with the case. ’Without favour towards our mother city; but with equal regard for her rights, and for those of the captain of the packet-boat; both are. held sacred, when lawful;' and the law must decide the conflict between the parties.
' From the facts of the case, the following questions of law, are first presented:—
1. Has Captain Jarvis a right to recover damages for the trespass, committed on his rights, as bailee of the cargo, or as salvor of a part 1
2. If he can recover in either character, to what extent may he support his. action ?
In order to answer the first question, we are to enquire : What was the position of Jarvis ?
He had taken the command of the cargo upon an express agree- *131 meut with the consignees; with the permission of the defendant, Pinckney, — the consent of the captain ; and the plain acquiescence of the passengers, in order to save the goods, and to make a pecuniary gain for himself, at the risk of his life.
Those facts amount, clearly, to an occupancy and possession, in right of the owners; and, for their benefit; coupled with a personal interest, for himself.
What character does such a position give to Jarvis ? Evidently, he was an agent, standing in the place of the owners, for an important purpose, and with interests, which vested in himself, as soon as he took possession, which makes him either bailee of the whole cargo, or of the part ne had landed, with the right of salvage. If a bailee, (for instance, a factor, a carrier, or consignee ; and these are adjudged cases — 2 Harp. 332. 2 Bailey, 473. 2 Saund. 47. D. N. 7 Term, 359 — 1 do. 113. s. 11, Black. 81. Buller’s N. P. 38 and 557,) can maintain actions, upon their possession of goods, so confided to them, there can be little question, that Jarvis stood within the reasons, (possession and interest,) that such bailees have in the goods confided to their charge. And it follows, that he must have Ms case governed by the same rule of law; and may, therefore, maintain the same actions.
But the second question remains : To what extent may the plaintiff recover damages ? Shall he recover to the amount of his expected reward only, i. e. for salvage — or for the value of the cargo 1 Which last inquiry, subdivides itself, into the question, whether, for the entire cargo, or so much as he actually saved from the wreck 1
In all the cases before noticed, — the factor, the carrier, and the consignee, can sue for, and recover, not only, for their own commissions, or freight, but for the full value of the goods taken, or destroyed. They are the agents of the owners, and stand, as owners, to all the world, but the individual proprietors, themselves. But, it is not allowable for strangers, who have trespassed upon the rights of possession, to set up, by way of defence, a title, in better owners ; whose claims are represented by the very agents, that bring the action. The outstanding title of the true owners, is one of the conditions of the agent’s action ; and the better it is proven in them, the stronger the right of the bailee to recover the whole value of the goods. Because he represents their claims jointly with his own interest in their property, by virtue of his contract.
In the particular instance before us, I may add, on the part of Jarvis, that his rights, as bailee, are far from being lessened, by the fact, that he entered into the contract with the consignees, and began the work with the formal consent of one of the defendants, and the other defendant acted under the direction of the former, in destroying the cargo. While, in the same degree, as such privity strengthens the claims of Jarvis, it weakens the defence set up, by men, who infracted. Interests, which they, themselves, had acquiesced in ; and contributed to render, if not more lawful, at least, more to be confided in, by the plaintiff. Let it be here remembered, that the consignees employed *132 Jarvis, with the formal consent of Pinckney; and Jarvis put himself under the conditions required by Pinckney.
It is then, plain, .that Jarvis had a right of action, as bailee of the cargo ; or at least, ®s bailee of so much, as he had landed on Folly Island. That he has a right of action to the latter .extent, is the opinion of the court.
But, it is still argued, that there was a divided possession of the cargo, between Jarvis and the owners.
On this head, it is urged, that although the consignees gave to Jarvis, the right to take possession of the whole cargo, it was only for the purpose of salvage ; and, therefore, he is entitled to recover only for so much, as he actually took out of the hull, and lauded in safety.
On this last question, I submit my own opinion only, on what I consider the law of bailments. It must be resolved, by the import and meaning of the agreement, with the consignees, — Jarvis’ agency, under it, and the fact of his possession of the whole cargo.
I grant, that, as an ordinary salvor, Jarvis could be in possession, of no more, than the part, he had saved; and therefore, bailee, for so much, and no more. But, this is, by implication of law; which authorizes any man, to save goods, when wrecked, for the owner, with an interest vested in salvage, upon the part saved, which makes him bailee, for so much, and no more. But, when, there is an express agreement, with a named individual, there is no room for mere implication — no other person is authorized; and the agreement becomes the law of the case; and decides the extent of the bailment. Now, then, what was the agreement of Jarvis with the consignees, (J. & J. Calder.) In their letter, to Captain Dickinson, (which Calder declares to be the only evidence of the agreement,) the consignees say—
We have now engaged, with the sanction of the City Council, Capt. Charles Jarvis, of the packet boat Clara Fisher, to go down, with about sixteen men, for the purpose of discharging the whole cargo upon the beach; and conyeying it to such part of the island, as may be necessary to get it on board of lighters, from-. Captain Jarvis, with his party, are to have the whole job to themselves, upon salvage, and no other person, besides them and yourself, and crew, are to go on board of the brig.”
By this letter, we see that Jarvis was to take possession. For, how else, could he discharge “ the whole cargo, and carry it to the island, and have the whole job” to himself, and his men 1 And, neither the consignees, nor any body else, disputes the fullness of his possession, but strangers. ' '
According to my understanding of it, the letter plainly indicates a contract with Jarvis, to take possession, for the purpose of saving the whole cargo, for the owners, and to make salvage for himself, and his associates, in their perilous enterprise, in exclusion of all other persons. No other person could have touched it, without trespassing. But did he take practical possession of the whole cargo 1 To answer this, we must inquire into the facts of Jarvis’ possession. Captain Dickinson is full on this head. He says, &c. “ that Captain Jarvis came down with a number of men, as salvor of the caigo,” &c. “ and *133 be andthis mep, landed, or helped to land, all the goods landed from the brig, on Folly Island. That Jarvis took possession of the goods, as agent, &c. of the consignees, and that the greater part of the cargo was saved from the wreck, and landed on the beach of Folly Island."
That Jarvis, then, took possession of the cargo, in the character of an agent, is as evident as his contract so to do. He fulfilled it, as far as in him lay; and would have completed the whole work of landing the cargo, in all reasonable probability, but for the obstruction of the defendants.
If there is any room for drawing; a line of demarcation, between his possession of the part landed, and the part which was burnt in the hull of the brig, it arises, from his character, as salvor, which is supposed to confine him to the part actually saved. For, considered, as a supercargo, factor, or consignee, he would have been, very clear, ly, in possession of the whole, upon facts of possession, much less comprehensive, and practical, than those proven by the captain.
But, was he not in possession, with a vested, and even exclusive right, (which was a main part of the contract,) to make salvage out of the whole cargo 1 To do the whole work, upon salvage, was the very object, for which, with his eyes, wide open to the danger, he periled life. He did not then, stand on the footing of a mere gratuitous salvor.
To my understanding of the contract with the consignees, the moment Jarvis had come within the tainted atmosphere of the brig, and broke bulk, with the consent of Captain Dickinson; from that moment, neither in law nor equity, could he be ousted of his lien, upon the whole cargo; (to be measured, it is true, by salvage upon the part actually saved.) He earned, arid paid for his lien upon the whole cargo, the instant he breathed the cholera atmosphere ; and the contract was sealed, with the first package he took out of the hull.
Call him salvor, or what you please, (“ qui heret in letiris, heret in cortice,”) his rights, in this action, depend upon the investure of rights in himself made by the contract with the consignees; not by mere implication of law. And if such a contract was entered into, as gave him a lien on the whole cargo, for the purpose of saving it, for his own advantage, in requital of the peril, incurred by entering the brig, the owners, themselves, could not have divested his possession, or obstructed the completion of his work, for salvage, and, of course, no stranger can do so.
Such a contract was lawful; and we are to look at the object and intent of the parties; and having once seen them; and felt their binding force upon the parties, themselves, no act of a stranger can alter their efficacy, or lessen the advantage of the plaintiff’s position. Call him what you will, he stood as bailee of the whole, with the exclusive right to commissions for salvage, contingent, only, upon the success of his own exertions; and to deprive him of the prime material, upon which he was to labor for such commissions, is to take away his commissions. It is true, that his interest was usufructuary; but take away the estate, and the usufruct follows. Take away the materials, *134 upon which, his lien for salvage depended, to be measured by his sue-cess; and you take away his vested rights. Is not this the actual estate of every carrier, consignee, factor, or supercago, in the goods confided to his charge — he is placed in possession of them, witli a vested right to make commissions, contingent upon the prospective fulfilment of his own undertaking, to carry, to sell, or to keep safe. Jarvis stood as supercargo, in possession, with the exclusive right to salvage, unless he abandoned his charge. The moment he took possession of the goods, Captain Dickinson’s superintendance over them, ceased; he was Captain only of the hull, rigging and crew; arid Jarvis stood as the superintendent of the cargo. Is not this, plainly, the state of the cargo; both, as between the Captain and Jarvis; and between him and the consignees?
And, when the thing is plain as between the plaintiff, and the owners, or consignees, who could not have ousted Jarvis, are we to be astuse, in order to confine him to the ordinary rights of a gratuitous salvor; when the question is between him and strangers; and when, too, one action, under a more liberal view, is calculated to arrest a hundred other suits. For, otherwise, every passenger, and owner, who had something left behind in the hull, would have a right of action, for his particular loss. And, thus the seeds of litigation would .spring out of the very principle upon which the case would be decided.
The question of the extent of salvage is not before the court, in any respect. It belongs to another tribunal. But it is clear, that his vested right to make salvage, was infracted, by destroying the goods in the bull; and the fruit of his labor, and risk, lessened, by so much; which is the evil, that gives aright of aclion for the whole cargo.
How is it, that every factor, in possession, may maintain such an action, before he has earned any commissions, by selling the goods? It is, because, he has a right to make commissions, out of the goods, by selling them; and his power to sell, depends upon his possession. In like manner, the power of Jarvis, to make salvage, depended upon the possession given him by the Calders. Such cases are identical, in principle.
They equally present the case of a bailee, who is to recover for the owners, and himself, without qualification.
In such cases, the trespasser has not the right to make advantage out of his own act; — hold the goods in .his own hands, and dole out justice, as successive claimants appear. Having put himself in the wrong, he must restore the bailee to all his rights ; or pay full indemnity, for all the parties concerned, in the action of their bailee.
For the authorities, from which I derive my conclusions, in addition to those before quoted, see 4 Term. R. 490 — 7 Term. 9 — 1 Term. 480 — 2 Bos. and Pull. 44 — 1 Roll. Abr. — £ Wils. 23 — Com. Dig. Tit. Abatement, cum multis aliis.
But I have found no express adjudication, in which the commissions, or interest of the bailee, were to arise, by reason of labour and skill expended, in saving the goods bailed to him, from the perils of shipwreck, with which they were beset, as, in this case. And my reasoning, of course, must be from the principles, and rationale of other *135 cases of bailment, in connection with the contract, made with the consignees, and the extra hazard, to which the plaintiff exposed his life. It may be said, and truly, that Jarvis made no specific contract with the passengers.
This may constitute, an exception, if any of them had furniture, still in the brig, which is very improbable. But, at all events, this must be the subject of evidence. And I would say, that where passengers looked on, in silence, for two days, and saw the plaintiff sa-vit>g their goods, under a specific contract, 'prima facie, they adopted it, if there be no counter-evidence. Let it, then, be a subject for proof.
Having settled the principle of law, that the plaintiff, as salvor, has a right of action, to the extent of the goods actually taken out of the brig, and carried to Folly Island; and having expressed my own opinion, that the plaintiff’s rights, as bailee, might be extended to the whole cargo, in favour of the owners, — whether it would operate in his own favour, or not; 1 will proceed to consider other matter of law, ’ upon which a majority of the court are again united. The question for consideration, is now, as follows. Are the defendants justified, notwithstanding the general doctrine in favour of bailees, by reason of certain general principles of fundamental and paramount law, which arise out of the facts and character of this very peculiar case.
It is pressed, strongly, that the common safety required that both brig and cargo should be destroyed, as a common uuisance. But, it must be observed, upon tins head, that, at least, two opinions existed ; and the medical advisers of the City Council, and the board of health, recommended, no more, than that the vessel should be destroyed, not the cargo. And, I cannot but suspect, that the true intention was to destroy no more than so much of the cargo, as remained within the vessel; and by this means, to prevent the further loss of life among desperate salvors.
Tnc argument further urges, that the alarm being great, and the exigency calling for decisive action, the emergency excuses the trespass ; and the legal right of every man to abate a common nuisance, justifies the defendants in destroying the vessel and the cargo, whether within or without the hull.
But, this is, evidently, too sweeping, and general .a position. The pan of the cargo burnt, on Folly Island, had no characteristics of a nuisance. Nor can I understand, that when so removed from the brig, the goods saved from the wreck, created any alarm, or indicated any danger. But, in the hurry of the crisis, no distinction was made ; and that which had been part of the cargo, was holden so still.
This complex argument, then, in its proper force, applies only to the brig, and the goods, still within her hull.
But what is a common nuisance? Hawkins, 1 v. p. 360, defines it to be “ an offence against the public,” either by doing a thing, which tends to the annoyance of all the king’s subjects ; or, by neglecting to do a thing, which the common good requires. This is the established definition. If a ship be sunk in a port, or haven, she *136 may become a nuisance, by obstructing navigation. 2 Litt. 244. To manufacture acid spirits, sulphur, vitriol, or aqua fortis, in the neigh-bourhood of dwelling houses, so as to annoy the inmates, may be a nuisance. 1 Burr. 333.
If the brig constituted a nuisance, it must have been, either by obstructing the highway, or by diffusing pestilence abroad. But, both of these depend upon the place of the supposed nuisance. But, the •mere fears of men, although reasonable, will not constitute a nuisance. 3 Atk. 21, 725 — 750.
Now, had the Amelia the esscutial characteristics of such a common nuisance ?
She had been thrown, by stress of weather, upon the shoals of our coast; and lay in the water unmanageable, and fixed ; but not in a port or haven. Did she obstruct any other vessel? No. Could she hurt any one who did not go on board of her 1 No. Did she lay in the way of any people ? No.
A nuisance presupposes something noisome to the neighbourhood,— or dangerous to the people, in their common and legitimate walks, or obstructing common convenience.
But the Amelia contained within her hull, a poisonous element, which might infect any one who went on board. But, then, as much might be said of every apothecary’s shop in the city, if you will go there, and absorb the poison. But seek not the poison, and you are safe ; and so of the Amelia, she lay in no man’s way, and no man need go on board.
Once make the touchstone of a nuisance, to consist, in any annoyance to men, from voluntary touching, tasting, or smelling it; and you may, in the same way, seek out, five hundred nuisances, within half a mile of the court house. Not a house, when, unfortunately, the receptacle of a loathsome disease, could escape.
And are the wreckers, or others who visited the Amelia, to cry her down, as a nuisance, by reason of their visits, when, they themselves did the only act, that could render the disease, a common nuisance. The true offence, if any there be, was, in their visiting her, at all, at the hazard of the public health. They did, an act, which, in the language of Hawkins, “tends to the annoyance,” (nay, danger,) “of all.”
And the legal remedy, was, not in abating the brig, or, the wreckers; but, in proscribing their return to the city. And this was wisely, and legally done; in the first instance.
And I must here add, that it is well, for Jarvis, that he represents the unfortunate owners. For, to give him, smart money, or damages, for his disappointment, in a voluntary work of such peril to himself, and his fellow-citizens; one cent, beyond his strict right, as salvor, I hold out of the question.
It is well, I say, that he is bailee, for other men, who are blameless; and, at whose hands alone, he deserves well; and, who, now, claim justice, for themselves, without reference to his merits, or demerits.
It is their rights, not Jarvis’; which are, throughout the case, in the eye of the court; and the object of legal protection.
And, I am well persuaded, that the whole error of the verdict, con- *137 listed in a confused idea, that the claims of Jarvis, were the true consideration, and gist of the action. Whereas, his deserts, — meritorious, or demeritorious, has nothing to do with it.
And, pardon the reiteration, when 1 say, that the same mistake is at the bottom of the difference of opinion among the court, upon this point. Jarvis’ name is as the more accidental locus in quo," or point of union, at which all the rig-bts of the owners meet.
And we cannot, try the case, upon its strict legal merits, unless we conceive aright, upon this distinction; And can abstract the case of the owners, from the name of Jarvis and salvor. Only imagine, that up. on the intelligence of cholera, iu an unknown ship, in the situation of the Amelia, Pinckney and Knight had gone down and burnt her and her cargo, in and out of the hull; and the sole owner had brought this action; and you then have ihe precise case before us.
Still, there was danger, that thoughtless men might go on board— catch the infection; arid the disease might spread. I say, it might spread; — For the contagionists, and the non-contagionists, have not yet settled their controversy on the subject.
But, be the truth what it may, neither the deleterious atmospheres nor the unfortunate position of the Amelia, had been the spontaneous work of the owners — No man was to be blamed.
The supposed nuisance did not inhere,- in the character of the brig; but had been brought within her hull, by misfortune; and her position was, also, unavoidable. It could not, then, be called a nuisance.
Th re are two ways of getting rid of a common nuisance. One is, by indictment — And that will test the principle, in the present instance.
Now, I ask, can any one suppose, that the captain, or owners, could have been found guilty, in such a case? It would want the essential characteristic of culpability, or wilfulness; and could not be made a public nuisance. The “ actus Dei” would have been a decisive justification for the defendants.
There was, then, no legal right to destroy the brig, or cargo, as a public nuisance.
But, although no nuisance, strictly speaking, it is still urged, that, as the danger to human life was great, it might be destroyed upon the principle, that private property may be taken for the public use.
This is, perhaps, the best ground on which the defence can be bottomed. It was just, sate, and humane, that the evil should be removed; and there was much reason that the defendants should undertake the removal. They have their reward in the merit of their energetic conduct; and are entitled to our thanks.
But they cannot stand justified in law, upon this ground; for two reasons. 1. Because, none, but the department of government, which holds the practical sovereign power, can exercise the eminent domain; or right of using private property for public purposes. And 2. That, even when exercised by the proper department, it can only be done upon just compensation.
Boih the Federal and State constitutions agree in the principle of compensation. (See 5, 6 and 7 arts, of amds. to U. S. con.; and 9 *138 art. 2 sec. of the State consti. 2 Kent’s Com. 375. 3 Story, 661. Rawle, 12.)
And Chancellor Kent informs us, and no doubt with perfect truth, that the constitution of every State in the Union requires compensation as a sacred principle. And this principle must be, without exception, or it becomes a mockery.
It follows, then, irresistibly, that compensation must be made to the owners; and they can demand it of no one, but the defendants; who, doubtless, will be kept harmless, by the City Council. The plaintiff might have asked compensation, at their hands. He had two legal courses within his power. To ask compensation, ex gratia, of the Legislature, or City Council; or to claim it, ex debito justitia, of the defendants. He has chosen the latter; and demands strict legal justice.
But this last view unfolds the true character of the defence. The defendants acted as men on board of a ship, beset by a tempest, when it has become necessary to put a part, or the whole of a cargo overboard ; and they do so, in order to save ship and life. But what follows the act ? Why, the loss must be made up by all who are saved. In mercantile language, it is an average loss, to be measured by the value of the thing destroyed. But the plaintiff must first recover, and fix the amount of the loss.
Can any man wish that the owners should not be paid for the sacrifice made of their property, in order to save the community from a possible pestilence. Such a thought may have glanced into the heart of a man, who thought of the danger that threatened, without reflecting that it came by the fault of no one. And well he might have said, abate the evil by fire. But, if just, he would have added, — we will justify the act, and make it lawful, by full compensation. Our money, — the losers will have a right to ; but we have a right to save our lives, which are jeopardized by their misfortune. In these sentiments are to be found the whole philosophy of the constitution, and the law upon the subject.
The emergency affords an excuse for the trespass. The defendants could not be found guilty of a riot; but it is compensation alone, that can justify, and make the act lawful.
But, upon the subject of taking private property for public use, I have, already, during the term, been so full, in the case of the State vs. Dawson, that I will do nothing more, at present, than illustrate the doctrine, by a fact that came out in the argument.
Mrs. Gibberson, one of the passengers, and freighters of the Amelia, applied to the legislature for compensation, for her loss, and received it fully.
The highest tribunal in the State, has, then-, taught us, by their example, that this must be an average loss. And we ought to bear the general contribution cheerfully, — i. e. to the extent of the diminished value of-the goods, as they stood; which is the real loss of the owners.
But, here again, it may be inquired, why does not the plaintiff, for the owners and salvors, ask for such recompense of the legislature ?
*139 The answer is, that they have a right of action against the defend, ants, who' destroyed the property ; and are not obliged to ask it of the State. The claim upon the State depends upon the necessity, and public call for the sacrifice made. And the plaintiff has chosen to put the necessity of such an application- upon the defendants.
But, as I understand the true character, moral, and object, of this very suit, it is virtually an application to the city authorities, by a suit against their agents, Pinckney and Knight. And it is referred to a jury, to determine what is the amount of the loss.
This brings us to the last question in the case — namely, Is the verdict for one hundred and thirty-six dollars, sufficient to satisfy the plaintiff for the loss of so much of the goods, as were safely landed on the terra firma of Folly Island ? The opinion of a majority of the court, confine the claim to that part of the cargo.
Upon this subject, we would say little — the valuation belongs to the jury. But, it appears to the court, that the part of the cargo carried to the island, must, under the most adverse circumstances, have amounted to much more money ; and, therefore, a new trial is ordered.
J. S. RICHARDSON.
Chancellor HaRper.
I am of opinion that the plaintiff is entitled to recover, both for the owners of the property and for himself, with respect to the property saved and landed on the beach. But not with respect to the property which was not saved, but remained on board the vessel. The special property, which is the sole foundation of his action, depends upon his lien on the goods, for salvage. But can he have a lien for salvage on goods which were not saved, but remained on board the vessel, liable to perish.
If the salvors had any certain and determinate interest in the property, I should think that under circumstances, as if the owner has also brought suit, the jury might find to the extent of their actual in. terest only. In Williams vs. Millington, 1 Hen. Blac. 81, where an auctioneer brought suit for goods sold, and the defence was, that the defendant had paid to the owner of the goods, it was said by Loughbo-rough, J., that if the auctioneer had given notice to the buyer, not to pay to the owner, he might in respect of lien, have recovered to the extent of his actual interest, for commissions, auction duty, and expenses. But a jury has not jurisdiction to estimate or allow salvage. That must be determined by another tribunal. That it may be properly submitted to that tribunal, and that the plaintiff may have the benefit of his lien, it seems to me, a matter of necessity, that he should recover for the owners as well as for himself.
On my construction, too, I think him entitled to recover for the other salvors, as well as himself. The contract, for salvage, was made with him. It appears to me, that the others were his agents and subordinates. It would not make any difference, that as com. pensation, he contracted to allow them a share of the salvage. This, however, was matter for the jury.
The damages, seem to me, to have been inadequate. Yet they might be within the competency of the jury, if -they were properly *140 instructed. In several cases, we have held, that where a trespass has been committed, and property destroyed, t-.e measure of damages is the value of the property ; and whatever circumstances of excuse, or mitigation, there may be on the part of the defendants, the jury shall not be allowed to exercise a capricious discretion in finding less than the value.
But in the case of- — , decided at Columbia, we held that where the tresoass was occasioned or provoked, by the fault or laches of the plaintiff, himself, the jury may have a discretion to find even less than the value.
These decisions, l think, involve the principles applicable to this case.
However pure and laudable the motives of the defendants may have been, and however necessary their act for the public safety, yet, , if there was no wrong or neglect on the part of the plaintiff, or those he represents, I should think him entitled to the actual value. If there were no such fault or laches, it would be unjust, that the burden of the loss, occasioned, however, uecessarily, for the public safety, should fall on the owners of the property alone. But if the ship had sailed from a diseased port, and sailed, voluntarily, up to a wharf in our port, with the disease on board, and she had been there destroyed, the owners would have had no reason to complain, if in an action, for the trespass, the jury should give only nominal damages. So any other neglect or misconduct of the owners, or their agents, might have the effect of reducing them below the actual value. The owners, in this case, were liable for any misconduct of the plaintiff, whom they made their agent, by a voluntary act; and he is liable for any misconduct of his agents and associates. If an actual necessity for the destroying of the goods, were occasioned by the plaintiff’s own misconduct, or that of those in whose right he sues, he could not complain of any damages, however small, which the jury might think proper to give. If by indulging in intoxication, they occasioned the disease to spread ; if they had brought infected goods into town, or had come into town themselves, at the risk of spreading the infection, — these circumstances might have been properly taken into consideration by the jury, according to what they might suppose their importance, and might have justified them in giving less than the actual value.
Upon this reasoning, I am of opinion the cause should be sent to another jury.
WM. HARPER.
Mr. Justice Earle.
I agree with the majority of the court, who think that a new trial should be granted. And I perceive no material difference of opinion, concerning the grounds on which it should be sent back. Concurring with those who think that the plaintiff, on a sound interpretation of the agreement with the consignees, was entitled to maintain trespass for the cargo landed and saved, for himself, and for those who were united with him ; and that he was entitled to recover the actual value, — I do not choose to consider the question, whether he was entitled to recover f irther. And I think it safest to express no opinion oil .the subject of mitigating damages, preferring to leave that question to the judge, who may try the cause.
B. J. EARLE.
Yu ad ow & Macbeth, for the motion.
Axson, City Attorney, and Dunkiij, contra.